UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:15-cv-184 (WOB)

KERI JELUS                                                                                          PLAINTIFF

VS.                           **MEMORANDUM OPINION AND ORDER**

ALL CREATURES ANIMAL
HOSPITAL, INC., ET AL                                                                       DEFENDANTS

This matter is before the Court on Plaintiff's motion for collective-action certification (Doc. 10) and cross-motions for summary judgment regarding an exemption to overtime-wage requirements of the Fair Labor Standards Act (FLSA). (Docs. 20, 21.) The parties agreed at oral argument that no issues of fact warrant a trial on the exemption issue and the Court may decide it on the existing record. Having previously taken the matter under submission (Doc. 39), the Court now issues the following Memorandum Opinion and Order.

*Factual and Procedural Background*

Defendants are All Creatures Animal Hospital, Inc. (ACAH) and its veterinarian owners Daniel Meakin and Linda Meakin. ACAH provides veterinary services, such as vaccinations, dental care, and surgery. In addition to pet-health services, it offers pet grooming, boarding, and training. Many pet products are also available for sale at ACAH, such as pet foods, prescriptions, shampoos, toys, and leashes, among many others.

Plaintiff Keri Jelus worked for Defendants as a pet groomer for three years, beginning in August 2011. Jelus's wages did not include a significant hourly-rate component. Instead, Defendants paid her almost entirely by commission, calculated as a percentage of the fee the

customer paid ACAH for the grooming service. Jelus's pay period cycled every two weeks. Defendants' payroll records show that she worked more than forty hours in several weeks during her three years of employment. Believing themselves to qualify for an exemption to the overtime-wage requirements of the FLSA, Defendants did not increase Jelus's normal commission percentage or otherwise supplement her compensation for the weeks in which she clocked more than forty hours. Jelus filed suit, seeking damages for her unpaid overtime hours.[1]

*Analysis*

For hours worked in excess of forty in one week, the FLSA requires an employer to pay its employee "not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). This requirement is subject to several exceptions. An employee is exempt from the right to overtime pay if: (1) "more than half [the employee's] compensation . . . represents commissions," (2) "the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate," and (3) the employee works at "a retail or service establishment." *Id.* at (i); 29 C.F.R. § 779.412; *McAninch v. Monro Muffler Brake Inc.*, 799 F. Supp. 2d 807, 810–11 (S.D. Ohio 2011). An FLSA exemption is an affirmative defense, and an employer must prove each element by a preponderance of the evidence. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501–02 (6th Cir. 2007). Jelus challenges each element.

With respect to this exemption, Department of Labor (DOL) interpretive regulations "are entitled to considerable weight." *Luther v. Z. Wilson, Inc.*, 528 F. Supp. 1166, 1171 (S.D. Ohio 1981) (quoting *Hamblen v. Ware*, 526 F.2d 476, 478 (6th Cir. 1975). Though not binding, courts interpreting ambiguous FLSA statutes or regulations have also often found persuasive the DOL Wage and Hour Division's (WHD) other interpretive guidelines, such as Field Operation

---

[1] Jelus also filed an overtime claim under Ohio's counterpart to the FLSA. Ohio's statutory scheme expressly incorporates the FLSA, and courts interpret them in a unitary fashion. *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). Therefore, the Court need not address the state and federal claims separately.

Handbooks (FOH), opinion letters, and published Fact Sheets. *See, e.g.*, *Fazekas v. Cleveland Clinic Found. Health Care Ventures*, 204 F.3d 673, 677 (6th Cir. 2000) ("[A]n opinion of the [WHD] Administrator . . . has persuasive value if [it] is well-considered and well-reasoned."); *Jastremski v. Safeco Ins. Cos.*, 243 F. Supp. 2d 743, 757–58 (N.D. Ohio 2003) (deferring to Administrator's opinion letter because it was factually similar and well-reasoned).

**A.**     ***Bona Fide* Commission**

While the FLSA does not define "commission," case law, DOL regulations, and other administrative materials clearly establish that Jelus's pay was by *bona fide* commission. A qualifying commission requires "some proportionality between the employee's compensation and the amount charged to the customer." *McAninch*, 799 F. Supp. 2d at 813 (quoting *Wilks v. Pep Boys*, 278 F. App'x 488, 489 (6th Cir. 2008)). A straight commission where "the employee is paid a flat percentage on each dollar of sales" amounts to a *bona fide* commission. *Viciedo v. New Horizons Comput. Learning Ctr. of Columbus*, 246 F. Supp. 2d 886, 896 (S.D. Ohio 2011) (quoting 29 C.F.R. § 779.413(a)(4)); *see also* DOL WHD FOH 21h04(a) (Jul. 12, 1990) ("[C]omput[ation of] an employee's compensation on the basis of [a] percentage of the charge to the customer . . . 'represents commissions on goods or services' for purposes of applying Sec[tion 207](i)."). Although many factors and nuances can affect whether more complicated pay systems amount to *bona fide* commissions, *see* 29 C.F.R. § 779.413(a)(2), (3), (5), § 779.416; *Viciedo*, 246 F. Supp. 2d at 896–99, this case does not implicate any of those nuances.

Here, Defendants paid Jelus a commission in its most basic form, a straight percentage of the fee charged to the customer for each service she performed. Jelus alleged in her own complaint that "Defendants paid [her] based on a grooming-fee commission." She further alleged that her commission was "calculated as a *percentage of grooming fees charged by the*

3

*Defendants to customers*." (Emphasis added). Defendants admitted both these allegations in their answer. Admissions made in the parties' pleadings are generally binding. *Ferguson v. Neighborhood Hous. Servs. of Cleveland*, 780 F.2d 549, 551 (6th Cir. 1986). In response to Defendants' "requests for admissions," Jelus admitted she "was paid on a flat commission basis." And in her written declaration supporting her motion for collective-action certification, Jelus represented that she "was paid by commission for [her] work. Commissions were *based on the amount of fees [she] earned for [Defendants] by grooming pets*." (Emphasis added).

ACAH's practice manager unambiguously swore to the same fact in four separate affidavits. (Doc. 7-1 at PageID 38, ¶ 13) ("[C]ompensation was based upon a percentage of the charge to the customer for the work she performed grooming the animal."); (Doc. 11-1 at PageID 105, ¶ 8) ("Plaintiff was paid a flat % commission based upon the charge for the grooming."); (Doc. 22-2 at PageID 219, ¶¶ 11–12) ("Dog groomers are paid a percentage of the charge to the customer for grooming the pet." Groomers were "paid [a percentage] of the charge to the customer."); (Doc. 26-1 at PageID 461, ¶¶ 6, 8) (Payment was "[a percentage] of the amount charged to the grooming customer." If ACAH charged the customer more, then "the groomer would be paid more."). Clearly this method of payment amounts to a *bona fide* commission because it is a "[s]traight commission . . . [where] the employee is paid a flat percentage on each dollar of sales." 29 C.F.R. § 779.413. With the exception of *de minimis* wages for staff meetings, vacation, and holidays, Defendants paid Jelus solely by a percentage commission.

Because Defendants' admissions of Plaintiff's allegations, Plaintiff's admissions of Defendants' requests for admissions, Plaintiff's declaration signed under penalty of perjury, and the practice manager's four sworn affidavits show—without contradiction—that nearly all of

4

Jelus's compensation was paid in *bona fide* commissions, the exemption's first element is met.[2]

### B.     One and One-Half Times the Minimum Wage

Defendants always paid Jelus more than one and one-half times the minimum wage. The second element of Section 207(i) requires that "the regular rate of pay of [the] employee [must be] in excess of one and one-half times the minimum hourly rate." 29 U.S.C. § 207(i); 29 C.F.R. § 779.412. The "regular rate" is an employee's total compensation converted to an hourly rate. 29 U.S.C. § 207(e); 29 C.F.R. § 778.109. If this rate does not exceed the minimum wage for a period, the exemption is lost for that period. *Id.* at 779.419(a). When possible, the rate must be established on a weekly basis. *Id.* at .419(a), .104 ("Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. . . . The rule is also applicable to [] employees paid on a commission basis. It is therefore necessary to determine the hours worked and the compensation earned by [] commission employees on a weekly basis."). However, DOL regulations also recognize exceptions to the weekly calculation where the compensation cannot be attributed to particular workweeks. *Id.* at 778.209(b) (If bonuses meant to cover multiple weeks cannot be attributed to when they were actually earned, a reasonable alternative allocation may be used.); *Id.* at .119–.120 (same for commissions).

"If it is not possible or practicable to allocate the commission among the workweeks of

---

[2]     Despite the overwhelming weight of the evidence, Jelus relies on *Wilks*, 278 F. App'x 488 and *Casanova v. Gold's Texas Holdings Grp.*, No. 5:13-CV-1161-DAE, 2016 WL 1241548 (W.D. Tex. Mar. 23, 2016) to argue there is no basis to establish proportionality between her pay and the amount charged to customers. Her argument appears to be that Defendants can establish the commission element only by records showing the number of pets Jelus groomed each week and the amount charged to each customer for those grooming jobs, which would allow a mathematical confirmation of the commission payments. Having carefully reviewed the cases on which Jelus relies, the Court finds that they do not support her argument, and any test of proportionality required in *Wilks* and *Casanova* is met here. In light of the fact that all record evidence relevant to the commission question shows that Jelus was paid almost entirely by a percentage of the amount customers actually paid ACAH for her grooming jobs, records that allow mathematical proof of a fact to which everyone agrees are entirely unnecessary.

Jelus also argues that the practice manager's affidavits and Defendants' memoranda contradict each other's description of Jelus's pay. She argues it is unclear whether: (1) she received compensation directly derived as a percentage of the grooming charge actually paid by each customer; or (2) she received a flat fee per animal groomed, without reference to the amount each customer paid for the grooming job. Stated kindly, Jelus either misunderstands or misrepresents the record on this argument, which does not merit further discussion.

the period in proportion to the amount of commission actually earned or reasonably presumed to be earned each week, some other reasonable and equitable method must be adopted." *Id.* at .120. The DOL considers it reasonable and equitable for the employer to allocate total commissions equally to: (1) each week in the pay period, or (2) each hour in the pay period. *Id.* Where the number of hours worked varies significantly from week to week, the second method may be more equitable. *Id.* at (b). Where an employer pays commissions at intervals spanning more than one week, several courts—including this one—have upheld the calculation of the regular rate by allocating total commissions among the weeks or hours in the pay period.

In *Luther*, the plaintiff worked as a real estate broker for the defendant and brought an action for unpaid minimum and overtime wages. 528 F. Supp. at 1168. The plaintiff was paid lump-sum commissions, often intended to compensate her for multiple weeks of work. *Id.* at 1174. Given the employer's payment method, this Court held:

> [F]or each pay period [], the hourly rate must be established according to the following formula:
>
> $$\frac{\text{total commission paid for period}}{[\text{total hours worked in pay period}]} = \text{hourly rate.}[3]$$

*Id.* at 1175; *see also Grimm v. Moore*, No. 4:14-cv-329, 2015 WL 2405362, at *3 (E.D. Tex. May 19, 2015) ("[C]ommissions on a specific number of weeks . . . must be divided by the total number of weeks for which it represents additional compensation[] to get the amount of commission allocable to each week." (Citing 29 C.F.R. § 778.120(a)(1))); *Vazquez v. TWC Admin. LLC*, No. 2:14-cv-07621, 2015 WL 2084486, at *9–10 (C.D. Cal. May 4, 2015) (relying on 29 C.F.R. § 778.120 to uphold employer's allocation of commissions equally to each week);

---

[3] Although the Court was calculating the "regular rate" to determine the amount of damages due to the plaintiff, the same definition and calculation applies to the Section 207(i) exemption. 29 C.F.R. § 779.18 (Definition of "regular rate" from 29 U.S.C. § 207(e) and discussed in 29 C.F.R. § 778, *et seq.* governing overtime compensation generally, "also governs the computation of 'regular rate' for purposes of the special overtime exemption of certain commission employees of retail or service establishments which is contained in section [207](i).").

*Sandoz v. Cingular Wireless, LLC*, No. 07-1308, 2013 WL 1290204, at *9 (W.D. La. Mar. 27, 2013) (In minimum wage case, stating that regulations governing both minimum and overtime wages "specifically permit allocation of lump commission payments equally across the weeks of the period of time in which they were earned.").

DOL administrative materials also indicate such allocation is acceptable. In a WHD opinion letter, the Administrator addressed four commission-based compensation plans submitted by an employer inquiring whether they met Section 207(i) requirements. DOL WHD Adm'r Op. Letter, 1982 DOLWH LEXIS 4 (July 13, 1982). All the plans used a monthly pay period, and some indicated the employer kept records that allowed it to allocate the commissions to the weeks in which they were actually earned. *Id.* Nonetheless, the Administrator opined that a plan complied with the regular-rate calculation of Section 207(i) where the total monthly commissions were allocated to each hour in the month under 29 C.F.R. § 778.120. *Id.* Other WHD opinion letters imply that the equal allocation of commission across all weeks or hours in a pay period does not contradict the weekly-calculation requirement, but rather, is a method of complying with that requirement when the employer's records do not permit it to allocate the commissions to the weeks they were actually earned. *See, e.g.*, DOL WHD Adm'r Op. Letter, 1966 DOLWH LEXIS 161 (August 10, 1966) (noting that "one and one-half" requirement must be applied on a workweek basis; explaining that the "workweek basis" requirement means the 207(i) exemption does not apply in any week where "one and one-half" requirement is not met; but finding that allocation under 29 C.F.R. § 778.120 meets the Section 207(i) requirement); DOL WHD Op. Letter, 1968 DOLWH LEXIS 152 (July 8, 1968) (same).

Yet another WHD opinion letter indicates that if an employer's record-keeping practices do not allow allocation of lump sums to the weeks those sums were actually earned, this amounts

7

to impossibility under 29 C.F.R. § 778.120.[4] The letter addressed a payment plan where employees were paid every two weeks but also received a monthly productivity bonus. DOL WHD Op. Letter, 1985 DOLWH LEXIS 47 (Mar. 15, 1985). The WHD cited 29 C.F.R. § 778.209 as governing the calculation of a regular rate involving bonuses. *Id.* This regulation is analogous to those concerning commissions. It requires that a lump-sum bonus be allocated to the weeks it was actually earned, but also includes an exception substantively equivalent to 29 C.F.R. § 778.120 when it is not possible to identify the weeks in which the bonus was earned. 29 C.F.R. § 778.209. The employer maintained records at its local offices showing daily hours worked by the employees and the work they performed each day. WHD Letter, 1985 DOLWH LEXIS 47. However, under the employer's record-keeping practices, this information was not entered into the main computer system through which it operated its payroll. *Id.* Under those circumstances, the WHD noted it was "not possible to allocate the bonuses among the workweeks of the month in proportion to the amount actually earned each week." *Id.* Implicitly recognizing the similarity between the bonus and commission regulations, the WHD stated that 29 C.F.R. § 778.120 provided further guidance to the employer on allocating the bonus. *Id.*

The WHD FOH and Fact Sheets further support the rule that an employer may determine an employee's "regular rate" by allocating total earnings across all hours in a pay period:

> In determining whether or not the employee's regular rate of pay is in excess of 1½ times the minimum hourly wage as required by [207](i)(1) of the FLSA, the employer may divide the employee's total earnings attributed to the <u>pay period</u> by the employee's total hours worked during such pay period.

DOL WHD FOH 21h03(b) (Jul. 12, 1990) (emphasis in original); U.S. DOL WHD, *Fact Sheet*

---

[4] 29 C.F.R. § 779.420 provides that an employer claiming the Section 207(i) exemption must keep records as specified in 29 C.F.R. § 516.16, which further refers to 29 C.F.R. § 516.2(a). Nothing in these sections requires an employer claiming the Section 207(i) exemption to record the amount of compensation attributable to each week. With respect to compensation, the regulations require only that the employer record the total compensation for the entire pay period. 29 C.F.R. § 516.16(c). Jelus has not pointed to any authority requiring an employer to keep such records. And even if an employer has violated an FLSA record-keeping requirement, that does not invalidate an otherwise applicable exemption. *Viciedo*, 246 F. Supp. 2d at 899–900; DOL WHD FOH 21h01 (Jul. 12, 1990).

8

*#20*, http://www.dol.gov/whd/regs/compliance/whdfs20.pdf (revised July 2008) (same).

Here, Jelus's hours were recorded by swiping a card upon arrival and departure. Payroll records show the hours Jelus worked each day, week, two-week pay-period, and year. Jelus has provided no persuasive reason to doubt the records' accuracy to show her hours worked and total compensation for each pay period. Although the payroll records show total compensation per two-week pay-period, they do not provide information allowing Jelus's total commissions to be allocated to the individual weeks in which they were actually earned. Jelus also admits she has not kept records that would allow this allocation. Because the records simply do not exist to enable such an allocation, the Court finds it is impossible under the circumstances to attribute commissions to the weeks they were actually earned. Therefore, under 29 C.F.R. § 778.120, a reasonable and equitable alternative allocation must be used to calculate Jelus's regular rate. Such allocation does not violate the weekly-calculation requirement, but rather, it is the only method by which that weekly calculation can be accomplished under the circumstances.

Defendants have elected to apportion Jelus's total compensation equally across all hours in the pay period. This is one of two methods expressly approved by the DOL regulations and the more equitable method in cases where an employee's hours vary widely from week to week, as Jelus's do here. Payroll records show she worked fewer than twenty hours in several weeks and more than forty-five in several others, with as much as a thirty-hour difference between weeks in some pay periods. Logic dictates that in weeks when Jelus worked more hours, she also likely groomed more pets. Therefore, the Court agrees that the per-hour allocation—which allocates more compensation to the weeks when more hours were worked—is more likely to attribute Jelus's commissions to the weeks they were actually earned. As discussed above, several cases, DOL regulations, and other DOL materials support Defendants' method of allocation.

Therefore, all that remains is to calculate Jelus's regular rate based on the allocations and determine whether that rate ever failed to exceed one and one-half times the minimum wage. The following table shows Federal and Ohio minimum wages for the applicable years.

| Year | Minimum Wages | Required one and one-half times the minimum wages |
|---|---|---|
| 2011 | Federal: $7.25<br>Ohio: $7.40 | Federal: $10.88<br>Ohio: $11.10 |
| 2012 | Federal: $7.25<br>Ohio: $7.70 | Federal: $10.88<br>Ohio: $11.55 |
| 2013 | Federal: $7.25<br>Ohio: $7.85 | Federal: $10.88<br>Ohio: $11.78 |
| 2014 | Federal: $7.25<br>Ohio: $7.95 | Federal: $10.88<br>Ohio: $11.93 |

Changes in Basic Minimum Wages in Non-Farm Employment Under State Law: Selected Years 1968 to 2016, U.S. DOL WHD, https://www.dol.gov/whd/state/stateMinWageHis.htm (last visited May 19, 2016).

Guided by the regulations and case law, the Court has used the per-hour allocation method to independently calculate Jelus's regular rate for every week covered by her payroll records. The lowest hourly rate Jelus ever earned in a week when she worked over forty hours occurred the last full week in March 2014. For that pay period, Jelus's pay was exactly $1,000, earned solely by commissions. She worked 80.63 hours in the period, 43.56 of which were in the final week of March. Dividing Jelus's total pay by the number of hours in the period shows her regular hourly rate was $12.40 (1,000 / 80.63 = 12.4). The next lowest regular rate Jelus ever earned was over $14 per hour, and the rate was typically closer to $20. Comparing her lowest regular rate to the required one and one-half times the minimum wage in 2014, it is clear that Jelus's pay was always higher, and the second element of Section 207(i) is met.[5]

---

[5] Although Jelus takes issue with the per-hour allocation, she does not suggest an alternate calculation method on the payroll records that exist. Even if Section 207(i) did not apply, it would still be necessary to calculate Jelus's regular

10

## C. Retail or Service Establishment

ACAH is a "retail or service establishment." The third element of Section 207(i) requires an employer claiming the exemption to qualify as a "retail or service establishment," meaning it must make at least 75% of its annual dollar volume from the sale of goods or services that are not for resale and are recognized as retail sales in the particular industry. 29 C.F.R. §§ 779.411, .24; *Luther*, 528 F. Supp. at 1172. This element involves a two-pronged analysis.

As a threshold requirement, the employer must be part of an industry with a "retail concept." *Homemakers Home & Health Care Servs. v. Carden*, 538 F.2d 98, 101 (6th Cir. 1976); 29 C.F.R. § 779.316. Regulations provide that a business with such a concept typically "sells goods or services to the general public," provides "services for the comfort and convenience of such public," "serves the everyday needs of the community," "does not take part in the manufacturing," and functions "at the very end of the stream of distribution, disposing in small quantities of [its] products and skills." *Id.* at .318; *Homemakers*, 538 F.2d at 104. The WHD has also promulgated lists of businesses to which the "retail concept" does not apply and those to which it may apply. 29 C.F.R. §§ 779.317, .320. Neither list addresses animal hospitals. Although doctors' offices, dentists' offices, and hospitals are expressly excluded, the WHD FOH explains the DOL's view that "[a] veterinary hospital is not a 'hospital.' . . . Therefore, an animal hospital may qualify" for the exemption if the other requirements are met. *See* FOH 21a01(d).

If an employer meets the threshold test, a second step requires that at least 75% of its sales of goods or services must be: (1) not for resale, and (2) recognized as *retail* in the particular industry. *Homemakers*, 538 F.2d at 105–06; 29 C.F.R. §§ 779.321, .322, .330. Jelus does not argue that Defendants make any sales for resale. Therefore, the second prong will focus only on

---

rate because that is the rate by which overtime wages—and, therefore, Jelus's damages—must be measured. Thus, for Jelus to succeed, she would have to use the same type of reasonable allocation method to prove her case.

11

the nature of sales as recognized in the industry. DOL regulations provide that "industry" is to be construed broadly, "including all industries wherein a significant quantity of the particular product or service is sold." *Id.* at .323. Although finding views of those in the industry to control the retail-sales question could allow employers to exempt themselves from certain FLSA requirements, their views are nonetheless "significant and material in determining what is recognized as a retail sale in a particular industry." *Id.* at .324. But recognition in the industry must also "include recognition of the retail nature of the transactions by disinterested sources." *Hodgson v. Crotty Bros. Dallas*, 450 F.2d 1268, 1281 (5th Cir. 1971).

The issue calls for a common-sense inquiry, considering the understanding and knowledge of purchasers, sellers, and any others with knowledge of the industry. 29 C.F.R. § 779.324. The question of whether individual sales are retail involves considerations largely equivalent to the retail-concept question discussed above. For example, retail sales are typically "made to the general consuming public" through numerous transactions of relatively small quantities. *Id.* at .328. In some industries, "the type of purchaser of goods or services [is a] determining factor[] in whether a sale or service is recognized as retail." *Id.* at .329.

Though not discussed or cited by either party, the WHD Administrator issued an opinion letter directly on point with respect to both prongs of the analysis as applied to the facts at hand. DOL WHD Adm'r Op. Letter, 1994 WL 1004771 (Apr. 11, 1994). The letter addressed "the application of section [207](i) of the Fair Labor Standards Act to groomers who [were] employed by an animal hospital" and "paid on a commission basis." *Id.* The employer was:

> an animal medical hospital where veterinarians perform[ed] all types of surgical procedures on all types of pets, primarily on cats and dogs. The establishment also offer[ed] a variety of pet services, such as flea dipping, grooming, and boarding of pets. The establishment [also sold] pet supplies and pet food.

*Id.* The Administrator provided that the animal hospital "may qualify as a retail or service

establishment if at least 75 percent of its sales are considered to be *retail sales* of goods or services." *Id.* (Emphasis added). The Administrator further explained:

> We would consider sales of goods or services made by an animal hospital to be *retail sales where they are made to the general public who are pet owners*. We would not consider sales to organizations such as incorporated farms, race tracks and the like to be retail sales for purposes of section [207](i) of the FLSA.

*Id.* (Emphasis added). The letter concluded: "Where an animal hospital qualifies as a retail or service establishment, its commission employees may come within . . . section [207](i)." *Id.*

ACAH belongs to an industry with a "retail concept." Administrative materials directly on point show that the DOL considers an animal hospital to have a "retail concept." The FOH expressly distinguishes an animal hospital from other medical establishments and states that an animal hospital may qualify for exemptions applicable to retail or service establishments. The Administrator's opinion letter further supports this position by describing an animal hospital that provides goods and services substantially equivalent to those ACAH offers and finding that the animal hospital may qualify as a retail or service establishment. Both stating that an animal hospital may qualify for the Section 207(i) exemption, these sources clearly show the DOL's position that an animal hospital passes the threshold test. ACAH also has the characteristics of establishments with a retail concept. Jelus admits ACAH offers veterinary services and pet products for sale to the general public. The provision of care to pets and the sale of pet products certainly serve the everyday needs, comfort, and convenience of the community in which ACAH is located. Finally, ACAH does not manufacture goods, and it operates at the end of the distribution stream, selling products and services in small quantities to individual consumers.

Because there are no binding statutes, cases, or regulations speaking directly to the retail-concept issue in the context of an animal hospital, the Court affords considerable weight to the administrative guidance that is directly on point and is offered by the body charged with

13

enforcing the FLSA. Therefore, based on the FOH, the Administrator's opinion letter, and the Court's finding that animal hospitals possess the characteristics specified in the regulations, the Court holds that ACAH belongs to an industry with a retail concept.[6]

Over 75% of ACAH's sales of goods and services are recognized as retail in its industry. ACAH provides many services, including: comprehensive veterinary treatment from preventative care to a variety of surgeries to euthanasia and cremation; pet grooming; pet training; and pet boarding. It sells pet supplies, including pet foods, prescriptions, shampoos, toys, treats, leashes, and many others. ACAH's annual revenue for the years 2012–2014 was approximately four million dollars each year. The parties have broken the sources of this revenue into many categories such as routine examinations, boarding, grooming, vaccinations, etc., and they dispute which categories qualify as _retail_ sales. Jelus argues that any services performed by a licensed veterinarian do not qualify, concluding that only 19% of the revenue is from retail sources. Defendants argue the veterinarian-provided services are retail, concluding that over 90% of the revenue each year is from retail sources. Defendants further argue that approximately 80% of ACAH's revenue is from sources other than licensed veterinarian services. ACAH's practice manager swore that "veterinary clinic[s are] recognized as offering retail sales and services in the veterinary industry," apparently suggesting that all the sales and services are retail.[7]

Pursuant to DOL regulations advising a broad interpretation of "industry," ACAH's

---

[6] Jelus argues to the contrary, comparing an animal hospital to medical establishments expressly listed by the WHD as lacking a retail concept. She relies on *Clark v. United Emergency Animal Clinic*, 390 F.3d 1124 (9th Cir. 2004) to argue that doctors and veterinarians are equivalent in analyzing FLSA exemptions. *Clark* is not on point. It addressed whether an exemption for "physicians and other practitioners of medical science" applied to an employee-veterinarian. *See* 390 F.3d at 1125. Although the Ninth Circuit found physicians and veterinarians perform analogous work, the case simply does not speak to the issues here concerning the nature of an animal hospital's business as a whole in the context of its industry. Nothing in *Clark* supports Jelus's broad reading of its holding.

[7] Although Jelus argues Defendants cannot rely on a self-serving affidavit, the Court need not ignore the testimony simply because it is favorable to Defendants. *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010) ("A court may not disregard evidence merely because it serves the interests of the party introducing it."); *Schultz v. Nalle Clinic*, 444 F.2d 17, 19–20 (4th Cir. 1971) (noting that, while the opinion of a medical clinic's manager concerning whether the clinic was a retail establishment was not conclusive, "this evidence is not to be ignored").

14

industry includes all businesses selling a significant quantity of veterinary services, other pet services, or pet supplies. The industry includes pet stores, veterinary clinics, "big-box" pet product stores, pet boarding/daycare businesses, pet-training business, and the like. Large retail stores like Petco and PetSmart fall into this industry. These businesses' websites show they offer an enormous selection of everyday pet products, such as foods, toys, and kennels as well as a variety of medications, vitamins, and dental-care products. Pet Supplies, Pet Food, and Pet Products from Petco.com, http://www.petco.com/shop/en/petcostore (last visited May 22, 2016); Pet Supplies, Pet Accessories and Many Pet Products: PetSmart, http://www.petsmart.com (last visited May 22, 2016). They offer several pet services too, including grooming, boarding, and training. Additionally, both businesses have branched into offering services of licensed veterinarians, from vaccinations to surgeries. Banfield Pet Hospital: Veterinary Health Clinic PetSmart, http://pets.petsmart.com/services/banfield/ (last visited May 22, 2016); Veterinary Clinics at Petco, https://www.vetcoclinics.com/services-and-clinics/clinic-locations-and-schedules-ip (last visited May 22, 2016).

Despite Jelus's contrary position, the sale of goods and services from a pet-industry business are easily distinguishable from sales in the human healthcare industry. It is logical that a typical pet-owning consumer walking into one of the big-box pet stores considers himself to be making "retail" purchases when he pays for a grooming job, heartworm medication, the administration of a vaccine, or a dental cleaning. Purchasing the same items from a smaller business like ACAH does not change the nature of the sale. The same purchaser receiving services from a healthcare-industry business likely considers herself a "patient," rather than a retail "customer." In the healthcare industry, a significant portion of the purchaser's cost is commonly born by a third-party insurer. Conversely, although pet insurance does exist, the

15

typical customer of either a big-box pet store or smaller veterinary clinic expects to bear the full cost of her purchase and to pay in full at the time of the transaction. Such a transaction is much more akin to making a purchase at a hardware store or hair salon than at a doctors' office. Therefore, the typical ACAH customer likely considers all her purchases there to be "retail."

In addition to the customer's own perspective, the WHD considers the nature of the customer to control whether a purchase from an animal hospital is "retail." In the opinion letter outlined above, the Administrator described an animal hospital that performed services and sold products substantially equivalent to those ACAH offers, including veterinary care, grooming, boarding, and a variety of pet supplies. Directly addressing which sales are "retail," the Administrator explained that the determination fell on what type of customer purchased the services or product. This opinion is consistent with 29 C.F.R. § 779.329, which provides that the type of purchaser may be a determinative factor in some industries. The Administrator's letter indicates that all goods and services provided by an animal hospital are retail if sold to individual, pet-owning consumers. Only sales to commercial organizations like farms and racetracks are not retail. In speaking to the retail question the Administrator in no way indicated that the type of employee providing the services has any effect on the issue.

The perspective of sellers in the pet industry also shows that all their sales are "retail." This perspective is evidenced by wide use of competitive pricing and advertising to draw customers in and away from competitors. For example, the home pages on both Petco's and PetSmart's websites feature full-screen advertisements for "20% off dog and cat food" and "20% off flea and tick preventative products." ACAH's website includes a similar page under "Specials," currently offering "Microchip Mondays: $20 off of Microchips on Mondays!" DVM Multimedia, Specials, ACAH, http://all-creatures.com/specials (last visited May 22, 2016).

16

ACAH's informational brochure contains similar advertisements and competitive statements: "We guarantee our products"; "we guarantee the lowest price, or we will price match"; "Don't pay extra for basic standards of care!"; "bundl[ing purchases] saves you money!"; with the purchase of a "wellness plan," the customer receives "20% off all services placed in a wellness plan, 10% off all additional services and products, free unlimited nail trims, 2 FREE office calls." Such advertising and open competition between competitors is much less prevalent in the human-healthcare industry. Petco, PetSmart, and ACAH all engage in competitive advertising and discounting tactics with respect to their pet products *and* services—including veterinary services—indicating that they consider all of these sales to be "retail."

Although views of one in the industry should not control the retail question, those views are "significant and material," and ACAH's practice manager swore that sales of animal hospitals are retail. While the Court also considers her view in light of the fact that she works for Defendants, the statement should not simply be disregarded. The practice manager has knowledge and experience in the industry, and her perspective should be given some weight.

The retail-concept characteristics also indicate that ACAH's individual sales are retail. Jelus admits ACAH sells its products and services to the general public and that veterinarians provide a service to the public when they care for the health of their customers' pets. Sales of vaccinations, necessary surgeries, other pet care, and pet supplies serve the everyday needs of the community. Finally, ACAH does not manufacture, nor does it sell items for resale. Instead, its sales are at the end of the distribution stream, in small quantities, to individual pet owners.

Again without binding authority as to which sales are "retail" in this context, the Court affords great weight to the DOL's position, as stated by the WHD Administrator's opinion letter. That letter is directly on point and provides that the sale of goods and services by an animal

17

hospital, including veterinary services, are retail if made to individual pet owners. Nothing in the record or on ACAH's website suggests that it provides any services or sells any products to the type of commercial establishments the WHD considers excluded from retail sales. Rather, the evidence suggests ACAH's primary customers are individual pet owners. This administrative guidance, the perspective of the typical pet-industry consumer, and the Court's finding that the retail factors apply to all ACAH's sales show that those sales are considered retail *in* the industry by disinterested *outside* sources. The perspectives of ACAH's practice manager and the typical pet-industry seller provide additional support for that conclusion. Therefore, nearly all, and certainly over 75%, of ACAH's annual revenue comes from the retail sale of goods and services.

Because ACAH is part of an industry with a retail concept, and over 75% of its annual revenue comes from retail sales, it is a "retail or service establishment." Defendants have met their burden to show all the requirements of Section 207(i), and the Court holds that they are entitled to summary judgment on the exemption's applicability.

Therefore, having carefully reviewed the record, the parties' arguments through both briefing and oral argument, the applicable law, and being otherwise advised,

**IT IS ORDERED AS FOLLOWS**:

(1) Defendants' motion for partial summary judgment (Doc. 21) is, hereby, **GRANTED**;

(2) Plaintiff's motion for partial summary judgment (Doc. 20) is, hereby, **DENIED**;

(3) Plaintiff's motion for collective-action certification (Doc. 10) is, hereby, **DENIED**.

This 26th day of May, 2016.



Signed By:
*William O. Bertelsman* WOB
United States District Judge

Case: 1:15-cv-00184-WOB Doc #: 48 Filed: 05/27/16 Page: 19 of 19 PAGEID #: 655